IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

CHUCKWUDI PERRY,                    )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )   1:10cv167(JCC/TCB)
                                    )
DAVID KAPPOS,                       )
Director of the U.S.                )
Patent and Trademark Office,        )
                                    )
        Defendant.                  )


**M E M O R A N D U M   O P I N I O N**

        This matter is before the Court on Defendant David

Kappos's (the "Defendant"), the Undersecretary of Commerce and

Director of the United States Patent and Trademark Office,

Motion for Summary Judgment [Dkt. 27] (the "Motion").  For the

following reasons, the Court will grant Defendant's Motion.

## I.  Background

        This case arises out of a former federal employee's

allegations of disability discrimination in violation of the

Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, and

retaliation in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e-3(a).  The facts are as follows.

A.   Factual Background

i.    Plaintiff's Work at the USPTO

The United States Patent and Trademark Office (the "USPTO") employed Plaintiff Chuckwudi Perry ("Plaintiff" or "Perry") as a Patent Examiner from January 22, 2007, to May 26, 2007.  (Complaint [Dkt. 1] ("Compl.") ¶ 9; Defendant's Memorandum in Support [Dkt. 28] ("Mem.") at 5.)  Plaintiff is an African-American male, who, among other things, holds bachelors and masters degrees in engineering, is an expert in applied cryptography, and holds two patents in cryptographic techniques. (Plaintiff's Opposition [Dkt. 33] ("Opp.") at 2.)  Upon his hiring at the USPTO, Plaintiff, like all newly hired patent examiners, was to complete an initial two-year probationary period that included training at the USPTO's Patent Academy (the "Academy").  (Mem. at 2.)  Plaintiff's Academy instructor and immediate supervisor at the USPTO was Jeffrey Pwu ("Pwu"), and his "second-line" supervisor was Andrew Wang ("Wang"), the Academy's class manager.  (Mem. at 2.)

ii.    Plaintiff's Condition

Plaintiff has monocular vision, *i.e.*, blindness in one eye, accompanied by an undiagnosed but continuing degenerative eye disease threatening loss of vision in, and requiring ongoing treatment for, his right eye.  (Compl. ¶ 46.)  By early February 2007, Plaintiff's vision worsened to where there was almost no

sight in his left eye.  (Perry Dep. Tr. 59:11-18, at Mem. Ex. 4[1].)  Plaintiff was also undergoing treatment to prevent losing sight in his right eye.  (Perry Dep. Tr. 59:8-10, at Mem. Ex. 4.)

Plaintiff holds a Maryland driver's license, which has two restrictions on Plaintiff's driving: "Corrective Lenses" and "Outside Mirrors Each Side."  (Mem. at 2; Mem. Ex. 3.)  While working at the USPTO, Plaintiff lived in Hyattsville, Maryland, and commuted to work by driving from his residence to the Metro and then taking the Metro to the USPTO office.  (Mem. at 2.)  Plaintiff refrains from driving at night, except for certain short, familiar routes he knows are well-lit.  (Opp. at 12.)

As Plaintiff characterizes it, he "is able to read, but his lack of depth perception, frequent sudden degradation of vision in his right eye, and inability to distinguish subtle color changes significantly hindered his reading ability."  (Opp. at 3.)

> Specifically, [Plaintiff] frequently loses his place when reading printed documents in small type, which requires him to use magnifying glasses and straight-edge-type devices to read efficiently; certain PowerPoint presentations that are not highly contrasting are hard to read and follow; and indoor fluorescent light makes reading and color perception at a computer screen even more difficult.  The cumulative effects of these conditions--which were the same when he was at [the USPTO]--frequently leave him fatigued and

---

[1] Exhibits to Defendant's Memorandum in Support [Dkt. 28-1, -2] will be referred to as "Mem. Ex. []."

needing to take a break or rest before continuing
work.

(Opp. at 3.)  "As a result of his eye conditions, Mr. Perry can

do an office job that chiefly requires him to sit before a

computer workstation, but will be less efficient than able-

bodied persons, requiring more time, and/or a flexible schedule,

to complete assignments."  (Opp. at 4.)

### iii.    Plaintiff's Requested Accommodation

Plaintiff asserts that, because his condition required

frequent visits to doctors and emergency rooms, which could only

be done during normal working hours, "he needed, but was not

afforded additional time to do his work after hours or on

weekends, *i.e.*, the flexible schedule."  (Opp. at 3.)  Plaintiff

could complete his Academy training only on computers connected

to the USPTO's network, and Pwu prohibited all students from

working on training or assignments outside of normal business

hours.  (Opp. at 3.)  Plaintiff met with Michael Salley, a

senior Equal Employment Opportunity ("EEO") specialist within

the USPTO's Office of Civil Rights (the "OCR"), and verbally

requested a flexible schedule, and also spoke with Pwu about the

flexible schedule and requested to speak with Wang.  (Opp. at 4-

5.)  While there is some dispute as to the facts surrounding

Plaintiff's requests, it is undisputed that he never received

any permission to work on a flexible schedule.

iv.     <u>Plaintiff's Informal Complaint</u>

In February of 2007, Plaintiff filed an informal, internal complaint of discrimination with the USPTO (the "Informal Complaint"). (Mem. at 7.)  While the events leading to this complaint are in dispute, that the complaint was internal and informal is not.  (Mem. at 7; Compl. ¶ 61 ("In February 2007, . . . Mr. Perry became embroiled in a disagreement with one of the [Human Resources] Department employees, and filed an *informal complaint* of discrimination about the incident." (emphasis added)); Opp. at 21 ("Therefore, Mr. Perry's *informal complaint* of discrimination was protected." (emphasis added)).)  Plaintiff filed the Informal Complaint in response to a dispute stemming from his January 29, 2007, discussion with April Irondi ("Irondi") in the USPTO human resources ("HR") department.  (Mem. at 6; Compl. ¶ 61.) Plaintiff requested a pay advance; when he received the advance the amount corresponded to a lower pay grade than Plaintiff's. (Mem. Ex. 22.)  On February 6, Plaintiff e-mailed Bernice Nesbitt, another HR employee, stating that he "had problems with Ms. Irondi and [he did not] want to deal with her anymore." (Mem. Ex. 22.)

It is not entirely clear from the record exactly on what day in February 2007 Plaintiff filed the Informal Complaint.  On the 6th of February, Plaintiff sent an e-mail to,

among others, Bismarck Myrick, assistant director of the OCR, stating that his "initial experience" with the USPTO had been an "unhappy one," that he wanted a written copy of the rules of the Academy, and that he wanted to make a legal request for an accommodation due to disability. (Mem. Ex. 23.) On February 15, 2007, Lisa Wade Dill, an EEO Specialist in the USPTO's OCR, e-mailed Plaintiff, responding to his "e-mail inquiry about how to file a complaint/grievance" and asking to schedule a meeting to discuss Plaintiff's concerns. (Mem. Ex. 24.) In a "Case Details Document for 07-56-47," Plaintiff is listed as the "Complainant," with Lisa Wade Dill and Philip Klemmer listed as "Counselors." (Mem. Ex. 25.) The complaint is listed as "Informal" under the heading "Complaint Type." (Mem. Ex. 25.) The Case Details Document lists the "Initial Contact Date" as February 14, 2007. (Mem. Ex. 25.) After his termination, Plaintiff filed a formal complaint with the EEOC on August 2, 2007. (Mem. at 9; Mem. Ex. 31.)

> v. <u>Plaintiff's Performance While at the USPTO</u>

The parties dispute the quality of Plaintiff's performance while at the USPTO. Defendant's claim that at the time Plaintiff was sent his termination letter, on May 23, 2007, he had not completed a single office action, *i.e.* patent applications, successfully. (Mem. at 5; Mem. Ex. 18-19.) Plaintiff, for his part, states that according to the USPTO's

job description for Perry, the number of completed applications was not a performance criterion. (Opp. at 25.) "[R]ather, learning how to perform patent examinations was the critical skill to be acquired during training." (Opp. at 25 (emphasis in original).) Defendant counters that trainees "needed to demonstrate that they were learning patent examination by *turning in satisfactory work product.*" (Defendant's Reply in Support ("Reply") [Dkt. 34] at 17 (emphasis in original).)

Plaintiff claims that Pwu "assigned everyone in Mr. Perry's class of trainees their 'docket' of applications on February 12, 2007, [Opp. Ex. 6], but Mr. Perry first received his set of applications on March 8, nearly a month later. [Opp. Ex. 13]." (Opp. at 26.) Defendant counters that Plaintiff conducted a search for application number 10/488484 on March 1, 2007, and received the results by email, confirming that he had been docketed the application by at least that date, and that, in any event, Plaintiff's was not supposed to start working on his application until March 4, 2007. (Reply at 15; Reply Ex. 38; Pwu Dep. Tr. 116:15-19, at Mem. Ex. 1.)

The parties also dispute whether Plaintiff completed a certain "Personal Digital Assistant" assignment, an exercise due on March 1, (Opp. at 26; Mem. ¶ 7), and dispute whether certain of the applications Pwu assigned Plaintiff were subject to the USPTO's "Sensitive Application Warning System" ("SAWS") and,

thus, were much more difficult and time-consuming than typical applications and are not typically assigned even to first-year trained examiners. (Opp. at 26-27; Reply 15-16 (stating that "SAWS cases are 'special' because they concern 'sensitive' material," and not because they are difficult).) Clearly, the facts with respect to Plaintiff's performance are in dispute.

### vi. Plaintiff's Employment Since Leaving the USPTO

Since leaving the USPTO, Plaintiff has held engineering jobs at Booz Allen Hamilton and Veracity Engineering, where he currently works in the field of security. (Opp. at 4; Mem. at 6.) Before accepting these positions, he verified that he would be able to work on a flexible schedule, without which he would not have accepted either job. (Opp. at 4.) Plaintiff has also worked in real estate. (Opp. at 4.)

### B. Procedural Background

Plaintiff filed his Complaint on February 23, 2010. [Dkt. 1.] Plaintiff pleaded two counts: Count I, disability discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* (the "RA") (Compl. ¶¶ 44-58); and Count II, retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) ("Title VII") (Compl. ¶¶ 59-67).

On December 14, 2010, Defendant filed his Motion for Summary Judgment. [Dkt. 27.] Plaintiff filed his Memorandum in

Opposition ("Opposition") on January 18, 2011. [Dkt. 33.] On January 24, 2011, Defendant filed his Reply in Response ("Reply"). [Dkt. 34.] On February 1, 2011, Plaintiff filed a supplemental brief, styled a Citation to Recent Authority in Opposition [Dkt. 38] to Defendant's Motion. On February 2, 2011, Defendant replied in opposition [Dkt. 39] to Plaintiff's supplemental brief.

Defendant's Motion is before the Court.

## II.  Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted). The party seeking summary judgment has the initial burden of showing the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The party

opposing summary judgment may not rest upon mere allegations or

denials.  Rather, the non-moving party "must set forth specific

facts showing that there is a genuine issue for trial."

*Anderson*, 477 U.S. at 248 (quotation omitted).

Unsupported speculation is not enough to withstand a

motion for summary judgment.  *See Ash v. United Parcel Serv.,

Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  Summary judgment is

appropriate when, after discovery, a party has failed to make a

"showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

In reviewing the record on summary judgment, "the court must

draw any inferences in the light most favorable to the non-

movant" and "determine whether the record taken as a whole could

lead a reasonable trier of fact to find for the non-movant."

*Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th

Cir. 1991) (citations omitted).

### III.  Analysis

A.  Count I: Disability Discrimination in Violation
    of the Rehabilitation Act

In Count I, Plaintiff asserts a claim of disability

discrimination in violation of the Rehabilitation Act of 1973,

29 U.S.C. § 701, *et seq.* ("RA").  (Compl. ¶¶ 44-58.)  The RA

"can most readily be understood as the counterpart for federal

agency defendants to the employment provisions of the Americans with Disabilities Act[2] [the "ADA"]." *Cochran v. Holder*, No. 1:06cv1328, 2010 WL 447013, at *4 (E.D. Va. Feb. 1, 2010) (internal quotations and citations omitted); *see also Edmonson v. Potter*, 118 F. App'x 726, 728 (4th Cir. 2004) (applying ADA standards to RA claims). Under the RA a plaintiff may bring a "disparate treatment" claim alleging that an employer took adverse action against an employee on account of the employee's disability or a claim based on the defendant's failure to provide a disabled employee with a reasonable accommodation. *Id.*

In the Fourth Circuit, to establish a *prima facie* case for failure to accommodate under the RA, a plaintiff must show that: "(1) she was an individual with a disability within the meaning of the ADA; (2) the employer had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of the position; and (4) the employer refused to make such accommodations."[3] *Edmonson*, 118 F. App'x at 728 (citing *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

---

[2] The parties appear to agree that the 2008 amendments to the ADA do not apply to this case. In any event, as this Court has stated, the 2008 amendments to the ADA "do not apply retroactively." *Bateman v. Am. Airlines, Inc.*, 614 F. Supp. 2d 660, 670 n.1 (E.D. Va. 2009).

[3] Defendant, only for purposes of the Motion, has elected not to challenge the second, third, and fourth prongs of this test, *i.e.*, that the USPTO had notice of Plaintiff's disability, that with reasonable accommodation Plaintiff could perform the essential functions of the position, and that the USPTO did not make such accommodations. (Defendant's Reply in Support [Dkt. 34] at 9, n.7.) Accordingly, the Court will not address these elements here.

To establish discrimination based on disparate treatment under the RA, a plaintiff "must demonstrate that she: (1) is an individual with a disability within the meaning of the [RA]; (2) is otherwise qualified for the job in question; and (3) suffered an adverse employment action solely because of the disability."[4] *Id.* (citing *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 197 (4th Cir. 1997)).

Significantly, to succeed on either a "disparate treatment" or "failure to accommodate" claim, a plaintiff must establish that he or she was "disabled" within the meaning of the RA. *Cochran*, 2010 WL 447013, at *5. The threshold inquiry here for both the failure to accommodate and disparate treatment claims, then, is whether Plaintiff was "disabled" within the meaning of the RA.

i.      Whether Perry was Disabled under the RA

For an individual to be considered "disabled" within the meaning of the RA, he or she must "(i) ha[ve] a physical or mental impairment which substantially limits one or more major life activities; (ii) ha[ve] a record of such an impairment; or (iii) [be] regarded as having such an impairment."[5] *Hooven-Lewis v. Caldera,* 249 F.3d 259, 268 (4th Cir. 2001) (citing 29 U.S.C.

_____

[4] Defendant does not argue that Plaintiff was not "otherwise qualified," and it appears Defendant asserts a defense of legitimate, non-discriminatory reasons for Plaintiff's dismissal only with respect to Plaintiff's Title VII claim. (Mem. at 27; Reply at 14.) Accordingly, the Court will not address these elements here.
[5] Plaintiff does not assert "disability" under the "record of impairment" or "regarded as" categories. Accordingly, the Court will address only actual disability.

§ 705(20)(B)). "Whether [Plaintiff] meets the definition of the statute, and therefore can bring a claim under the statute, is a question of law for a court, not a question of fact for a jury," *Hooven-Lewis* 249 F.3d at 268, and Plaintiff bears the burden to demonstrate that his physical impairment renders him "disabled" under the RA. *See* Cochran, 2010 WL 447013, at *5.

Plaintiff alleges in his Complaint that the physical impairment that renders him "disabled" within the meaning of the RA is "monocular vision, *i.e.*, blindness in one eye, accompanied by undiagnosed but continuing degenerative eye disease threatening loss of vision in, and requiring ongoing treatment for, his right eye." (Compl. ¶ 46.) Impairment alone, however, is not sufficient to qualify as "disabled" for purposes of the RA. That impairment must "limit a major life activity" and that limitation must be "substantial." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002). For an impairment to become a "substantial" limitation to a "major life activity," it must "prevent[] or severely restrict[] the individual from doing activities that are of central importance to his life." *Toyota*, 534 U.S. at 195-196.

Defendant concedes that seeing is a major life activity, and this Court considers working a major life activity as well. *See* Cochran, 2010 WL 447013, at *5 (citing 29 C.F.R. § 1630.02). The issue, then, is whether Plaintiff's impairment of

monocular vision and degenerative eye disease has prevented or severely restricted his ability to see or to work.  The Court will address each in turn.

a.  <u>Seeing</u>

Courts must "determine the existence of disabilities [under the RA] on a case-by-case basis." *Albertson's v. Kirkingburg*, 527 U.S. 555, 566 (1999).  Although "people with monocular vision 'ordinarily' will meet the Act's definition of disability," whether monocular vision, like all impairments, constitutes an RA "disability" is a question determined on an individual basis. *Albertson's*, 527 U.S. at 567.  The RA "requires monocular individuals, like others claiming [its] protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial." *Albertson's*, 527 U.S. at 567.  Significantly, in *Albertson's*, as well as in *Sutton v. United Airlines, Inc.*, 527 U.S. 482 (1999), the Supreme Court directed courts that "mitigating measures must be taken into account in judging whether an individual possesses a disability," with no distinction "between measures undertaken with artificial aids, like medications and devices and measures undertaken, whether consciously or not, with the body's own systems."[6] *Albertson's*, 527 U.S. at 565-66.

_____
[6] Although Congress expressly overruled *Toyota* and *Sutton* by the ADA Amendments Act of 2008, as noted above, the ADA Amendments do not apply

Here, the extent of Plaintiff's limitation in his ability to see is not substantial. *Albertson's*, 527 U.S. at 567. Plaintiff has a driver's license and drove to the Metro as part of his commute while working at the USPTO. (Mem. ¶ 5.) Plaintiff generally refrains from driving at night, but even then can drive certain short, familiar routes he knows are well-lit. (Opp. at 12.) As Plaintiff himself puts it, he "is able to read." (Opp. ¶ 9.) Indeed, he is able to read documents in even small type, even "efficiently" with the aid of "magnifying glasses and straight-edge-type devices." (Opp. ¶ 9.) Plaintiff can see and read PowerPoint presentations that are not highly contrasting, though he has some difficulty doing so. (Opp. ¶ 9.)

By his own admission, Plaintiff "can do an office job that chiefly requires him to sit before a computer workstation, but will be less efficient than able-bodied persons, requiring more time, and/or a flexible schedule, to complete assignments." (Opp. ¶ 10.) Not only can Plaintiff do *an* office job, he admits in the Complaint that he could do his USPTO job, even without any accommodation--Plaintiff alleges that he "did perform[] the essential functions of his position [at the USPTO] with or *without* reasonable accommodation." (Compl. ¶ 48 (emphasis added).) In sum, Plaintiff's admissions in effect acknowledge

---

retroactively. *Bateman*, 614 F. Supp. 2d at 670 n.1. Accordingly, the Court will evaluate Plaintiff's claims in accordance with those decisions.

that the extent of his limitation, particularly when taking into account mitigating measures, is not substantial. *Albertson's*, 527 U.S. at 565-67.

### b.  Working

To substantially limit the major life activity of working, Plaintiff's impairment must "significantly restrict[] [him] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Sutton*, 527 U.S. at 492 (quoting 29 C.F.R. § 1630.02(j)(3)(i)).  "[T]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Cochran*, 2010 WL 447013, at *6 (internal quotation marks and citation omitted) (emphasis removed).  Federal regulations define the term "class of jobs" as "jobs utilizing . . . training, knowledge, skills or abilities" similar to the job from which the plaintiff is disqualified, 29 C.F.R. § 1630.2(j)(3)(B), and "broad range of jobs in various classes" as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment," 29 C.F.R. § 1630.2(j)(3)(B).

Here, Plaintiff is not substantially limited in his ability to work. That he is not so limited is evident by the fact that since being terminated by the USPTO, Plaintiff is and has been gainfully employed within his field of engineering and in the field of real estate. Thus, plainly he has not been significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes. *See Sutton*, 527 U.S. at 492 (quoting 29 C.F.R. § 1630.02(j)(3)(i)). As for a class of jobs, by Plaintiff's own admission he has held two jobs, with Booz Allen Hamilton and Veracity Engineering, where he currently works in the field of network security utilizing training, knowledge, skills or abilities similar to his job at the USPTO. As for a broad range of jobs in various classes, by Plaintiff's own admission he has held a job selling real estate, *i.e.*, a job not utilizing similar training, knowledge, skills or abilities. Moreover, given the large number of jobs available that do not require one to sit before a computer workstation all day, this Court cannot say that Plaintiff is precluded from a broad range of jobs. *See Sutton*, 527 U.S. at 492 ("[I]f a host of different types of jobs are available, one is not precluded from a broad range of jobs.")

Plaintiff makes much of the fact that "before accepting [his subsequent employment], he verified that he would be able to enjoy a flexible schedule, without which he would not

have accepted either job." (Opp. at 12.) The proper inquiry for both a "class of jobs" or a "broad range of jobs,' however, looks to whether a plaintiff is significantly restricted, *Sutton*, 527 U.S. at 492, from jobs that do or do not "utilize[e] . . . training, knowledge, skills or abilities" similar to the job from which the plaintiff is disqualified, 29 C.F.R. § 1630.2(j)(3)(B). The inquiry is *not* whether those jobs also provided the same or a different schedule or whether they provide any accommodation. As the Fourth Circuit has stated, "[w]here a worker demonstrates that his condition makes him unsuitable for a position with a particular employer, but demonstrates that he has 'no difficulty in obtaining other jobs in his field,' the worker has not demonstrated that he is substantially limited in his ability to work. *Hooven-Lewis,* 249 F.3d at 269 (quoting *Forrisi v. Bowen*, 794 F.2d 931, 935 (4th Cir. 1986)). Plaintiff has had no difficulty obtaining other jobs in and outside his field, and that he has done so is evidence that he can still do work in his field and others. Thus, this Court finds that Plaintiff is not substantially limited in his ability to work.

* * *

For the reasons set forth above, taking the record in the light most favorable to Plaintiff, he has not shown that his impairment rendered him "disabled" within the meaning of the RA.

No reasonable trier of fact could find that Plaintiff's condition substantially limited him in the major life activities of seeing or working. Accordingly, Plaintiff has failed to establish a *prima facie* case for failure to accommodate or for disparate treatment under the RA, and the Court will grant summary judgment in favor of the Defendant as to Plaintiff's Rehabilitation Act claim.

> B. Count II: Retaliation in Violation of Title VII of the Civil Rights Act

In Count II, Plaintiff asserts a claim for retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a) ("Title VII"). (Compl. ¶¶ 59-67.) Title VII's anti-retaliation provision provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). The burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), applies to Plaintiff's retaliation claim. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998). Under this burden-shifting regime, a plaintiff bears the initial burden of establishing a prima facie case of retaliation. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal quotation marks and citations

omitted).  Once the plaintiff carries this burden, it shifts to the defendant, who must "articulate a legitimate, non-retaliatory justification for the adverse employment action." *Id.*  "If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext."  *Id.*

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must prove three elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events."  *EEOC*, 424 F.3d at 405-06. Only the first and third elements are at issue in the instant matter.

### i.    Prima Facie Case

Plaintiff alleges that Defendant violated Title VII when "[a]fter Mr. Perry filed the informal complaint[7] [relating to a disagreement with one of the USPTO's human resources department employees resulting from Plaintiff allegedly not having received his salary for a pay period], Mr. Pwu initiated a sequence of actions to attempt to justify Mr. Perry's dismissal" that ultimately led to Plaintiff's dismissal. (Compl. ¶¶ 61, 63, 65.)  Plaintiff argues that his complaint was

---

[7] Plaintiff argues that though his complaint to the USPTO's HR department was informal, the Court should treat it as a formal complaint, because he testified that he would have made it a formal complaint but for Mr. Pwu's dissuading him from doing so.  (Opp. at 22 n.8.)  Plaintiff cites no authority supporting this argument, and it is clear from the record that Plaintiff's complaint was informal.  The Court will treat it as such.

protected activity under Title VII and that there was a causal link between the protected filing of the Informal Complaint and Plaintiff's dismissal. (Opp. at 19, 23.)

### a. Protected Activity

#### 1. Opposition or Participation Activity

Title VII protects two types of activity from retaliation--opposition and participation. *Cumbie v. Gen. Shale Brick, Inc.*, 302 F. App'x 192, 194 (4th Cir. 2008). "Opposition activity includes 'utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" *Id*. (citing *Laughlin*, 149 F.3d at 259). As for participation activity, "[t]o proceed under the participation category, an individual must make a charge, testify, assist, or participate in any manner in an investigation, proceeding, or hearing under Title VII." *Id*. (citing *Laughlin*, 149 F.3d at 259).

Importantly, "opposition activity is protected when it responds to an employment practice that the employee reasonably believes is unlawful," *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 338 (4th Cir. 2006) (citing *EEOC*, 424 F.3d at 406-07), whereas "[participation] activity is protected conduct regardless of whether that activity is reasonable." *Cumbie*, 302 F. App'x at 194 (citing *Glover v. S.C. Law Enforcement Div.*, 170

F.3d 411, 413-15 (4th Cir. 1999)).  Because the analysis of whether opposition activity is protected is "an objective one, the issue may be resolved as a matter of law." *Jordan*, 458 F.3d at 339.

Here, Plaintiff argues that the Informal Complaint was protected participation activity, (Opp. at 20), while Defendant argues it was unreasonable opposition activity (Mem. at 21). Specifically, Plaintiff, citing[8] to *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007), argues that "[i]t is well-settled that Title VII protects informal, as well as formal, complaints of discrimination," and "[t]herefore, Mr. Perry's informal complaint of discrimination was protected under the *participation* clause." (Opp. at 21 (emphasis in original).)  It is indeed well-settled that Title VII protects both informal and formal complaints, but that is not at issue here.  What is at issue is whether Plaintiff's Informal Complaint constituted *opposition* activity that is protected activity only when the complaint was reasonable, or whether it was *participation* activity and therefore protected irrespective of the complaint's reasonableness.

---

[8] Plaintiff also cites *Bell v. Gonzales*, 398 F. Supp. 2d. 78, 94-95 (D.D.C. 2005) for the proposition that "[o]nce [a] plaintiff . . . initiates pre-complaint contact with an EEO counselor . . . he is participating in a Title VII proceeding." (Opp. at 21.)  Plaintiff goes on to argue that in addition to *Bell*, the Eighth, Ninth, Eleventh, and District of Columbia Circuits would support classifying Plaintiff's informal, internal grievance under the participation clause.  This Court, however, sits in the Fourth Circuit, and will apply Fourth Circuit law.

In the instant case, Plaintiff's alleged protected activity was "an informal complaint of discrimination" about a disagreement with a USPTO human resources employee over Plaintiff's salary.  (Compl. ¶ 61.)  It is undisputed that Plaintiff did not file any sort of formal complaint and did not otherwise initiate any proceeding, charge, or hearing, until after his termination.  Although Plaintiff is correct that Title VII protects informal complaints, in the Fourth Circuit such informal, internal grievances are *opposition* activity, and not participation activity.  *See, e.g., Cumbie*, 302 F. App'x at 194 ("Opposition activity includes 'utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" (quoting *Laughlin*, 149 F.3d at 259)).

Plaintiff argues that the Fourth Circuit decisions in *Glover* and *Cumbie* "support protecting Mr. Perry's complaint of discrimination under the participation clause."  (Opp. at 21.)  The Court disagrees.  The plaintiff in *Glover* "filed discrimination and retaliation charges against [the defendant] with the South Carolina Human Affairs Commission and with the Equal Employment Opportunity Commission (EEOC)," *i.e.*, Glover filed a *formal* complaint with the EEOC.  *Glover*, 170 F.3d at 413.  And, as illustrated by the citation to the case in

Plaintiff's Opposition, (Opp. at 20), the *Glover* Court's holding was to decline to read the reasonableness test for opposition activity protection into the participation activity standard. *Id.* at 414. *Cumbie* expressly includes as *opposition* activity "utilizing informal grievance procedures," the very activity Plaintiff acknowledges he undertook. *Cumbie*, 302 F. App'x at 194 (citing *Laughlin*, 149 F.3d at 259). *Cumbie* also defines participation activity, stating that "[t]o proceed under the participation category, an individual must make a charge, testify, assist, or participate in any manner in an investigation, proceeding, or hearing under Title VII." *Id.* (citing *Laughlin*, 149 F.3d at 259). The activity Plaintiff alleges as protected was an informal, internal complaint, not a formal charge, *etc.*, under Title VII. Plaintiff engaged in opposition activity.

Plaintiff also points to *Jordan v. Alternative Resources Corp.*, 458 F.3d 332 (4th Cir. 2006), and *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397 (4th Cir. 2005), as illustrating that Plaintiff's "complaint of discrimination falls under the participation clause," because "by contrast [to *Jordan* and *EEOC*], here Mr. Perry had initiated an actual[9] complaint of discrimination in violation of Title VII." (Opp. at 22.) *Jordan* was an opposition activity case, where the plaintiff made

---

[9] As an initial matter, that Plaintiff filed an "actual" complaint is immaterial--the distinction between opposition and participation is not "actual" versus constructive.

an informal complaint with two mangers of the two companies he

alleged were his joint employers. *See Jordan*, 458 F.3d at 339

("[B]oth [the plaintiff] and the defendants agree that

[plaintiff]'s complaint to [the companies'] managers was

*opposition* activity.") (emphasis added). *EEOC*, too, was an

opposition activity case, because, as noted by Plaintiff in his

Opposition, "no investigation or proceeding was yet pending."

(Opp. at 20). Plaintiff's own characterization of *EEOC*, along

with the *EEOC* court's reasoning, do not support his argument.

In *EEOC*, the court found that the supervisor's refusal to

participate in the scheme to fabricate unfavorable personnel

records was, contrary to the district court's ruling, opposition

activity. *See EEOC*, 424 F.3d at 406. ("As we have recognized,

protected *oppositional activities* may include staging informal

protests and voicing one's own opinions in order to bring

attention to an employer's discriminatory activities, as well as

complaints about suspected violations.") (internal alterations,

quotation marks, and citations omitted) (emphasis added). This

internal, informal complaint or protest is exactly the type at

issue here; Plaintiff admittedly made only an internal, informal

complaint, which, in this Circuit, is opposition activity.[10]

---

[10] Plaintiff argues that, as a policy matter, "to hold that internal
investigations of discrimination do not enjoy the protection of the
participation clause would assure that employees would routinely bypass them,
and proceed directly to external agencies." (Opp. at 22.) Plaintiff is
incorrect--this Court, in following the case law set forth above in holding
that internal, informal complaints are opposition activity and, thus, do not
fall under the participation clause, does not therefore hold that *all*

Plaintiff argues that the Fourth Circuit case law "is
. . . contrary to the thrust of the Supreme Court's [] recent
decisions in retaliation cases, [] which supported
employees and strengthened protections for persons charging
retaliation." (Opp. at 21.) Plaintiff states that "[t]he
Supreme Court has recently reaffirmed that Title VII
complainants deserve 'broad protection from retaliation.'"
(Opp. at 22 (quoting *Burlington N. & S.F. Ry. Co. v. White*, 547
U.S. 53, 67 (2006)).) "By arguing that it should be free to
retaliate, Defendant cannot but discourage workers from bringing
charges of discrimination[, and Defendant's position] runs
counter to continuing Supreme Court jurisprudence."
(Plaintiff's Citation to Recent Authority [Dkt. 38] in
Opposition to Defendant's Motion ("Supp.").) As an initial
matter, the Court notes that Defendant does not argue that it
should be "free to retaliate." Defendant argues that Plaintiff
has not engaged in protected activity, because his Informal
Complaint was "opposition" and not "participation" activity,
and, thus, Plaintiff must also show that he reasonably believed
the complained-of employment conduct was unlawful.

Plaintiff's Citation to Recent Authority concerns the
Supreme Court's recent decision in *Thompson v. North American*

---

internal grievance procedures are not protected under Title VII. Rather,
this holding provides that internal, informal complaints *are protected* by
Title VII when the complainant *reasonably believes* the complained-of
employment action to be unlawful.

*Stainless*, *LP*, No. 09-291, --- S.Ct. ----, 2011 WL 197638 (Jan. 24, 2011), and argues that *Thompson* "supports [Plaintiff's] claim of retaliation in this case." (Supp. at 2.) Plaintiff cites *Thompson* for the proposition that "Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Thompson*, 2011 WL 197638, at *3 (quoting *Burlington*, 547 U.S. at 68). Both *Thompson* and *Burlington* are addressing the *employer's* response to the employee's action, and not the *employee's* activity, which is what is at issue here, namely whether the employee engaged in Title VII protected activity. *See Thompson*, 2011 WL 197638, at *4 (addressing the unlawfulness of an *employer's* third-party reprisal); *Burlington*, 547 U.S. at 61 (resolving a split in the Circuits, the Supreme Court "decide[d] whether Title VII's antiretaliation provision forbids only those *employer actions and resulting harms* that are *related to employment* or the workplace [and] . . . characterize[d] *how harmful an act of retaliatory discrimination must be* in order to fall within the provision's scope" (emphasis added).) As *Thompson* states, "Title VII's antiretaliation provision prohibits an employer from 'discriminat[ing] against any of his employees' for engaging in *protected conduct*." *Thompson*, 2011 WL 197638, at *3 (emphasis added) (citations omitted).

27

Moreover, *Thompson* does not address the issues presented here. First, both the *Thompson* petitioner and his fiancée filed *formal* EEOC complaints. *Thompson*, 2011 WL 197638, at *1. Second, the Court's holdings in that case are not applicable to the instant matter. *See id.* at *4 (declining to adopt a categorical rule that third-party reprisals do not violate Title VII and declining to identify a fixed class of relationships for which third-party reprisals are unlawful); *id.* at *6 (concluding that Thompson falls within the zone of interests protected by Title VII because he is a person aggrieved with standing to sue). Third, with *Thomspon*, *Burlington*, and the other Supreme Court precedent cited by Plaintiff, Plaintiff is correct that the cases establish that Title VII's retaliation provisions cover a broad range of employer conduct, but that is not the issue in the instant matter--the issue here is whether Plaintiff's Informal Complaint constituted protected activity at all, *i.e.*, whether his actions fall within the ambit of Title VII's retaliation provisions in the first instance. As to that issue, and the question arising from it addressed below, namely whether Plaintiff was objectively reasonable in his belief that the complained-of employment action was unlawful, the cited authority is not on point.

## 2.    Opposition Activity Plaintiff Reasonably Believes is Unlawful

Because the Court finds that Plaintiff engaged in opposition activity, the Court turns to whether the contested employment practice was actually unlawful or whether Plaintiff reasonably believed the employment practice he opposed was unlawful. *See EEOC*, 424 F.3d at 406 (stating that Title VII "protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful"). Because the analysis of whether opposition activity is protected is "an objective one, the issue may be resolved as a matter of law." *Jordan*, 458 F.3d at 339. Defendant argues, and Plaintiff does not counter, that Defendant could not have reasonably believed the relevant employment practice to be unlawful. (Mem. at 22–23.)

Here, the employment practice of Defendant's that Plaintiff contests violated Title VII is when, "[a]fter Mr. Perry filed the informal complaint [on January 29, 2007, relating to a disagreement with one of the USPTO's HR employees resulting from Plaintiff allegedly not having received his salary for a pay period], Mr. Pwu initiated a sequence of actions to attempt to justify Mr. Perry's dismissal" that ultimately led to Plaintiff's dismissal. (Compl. ¶¶ 61, 63, 65.)  The relevant opposition activity is Plaintiff's filing of

the Informal Complaint.  (Mem. at 6; Compl. ¶ 61.)  Opposition activity "is protected when *it responds to an employment practice* that the employee reasonably believes is unlawful," *Jordan*, 458 F.3d at 338 (citing *EEOC*, 424 F.3d at 406-07) (emphasis added).  Thus, as a matter of logic, the Informal Complaint could be *responding* to only employment practices that *preceded it*; here, only actions occurring before early February 2007.  This is significant because the "sequence of actions [initiated by Pwu] to attempt to justify Mr. Perry's dismissal" and that ultimately led to Plaintiff's dismissal, (Compl. ¶ 63), occurred after the Informal Complaint.

Plaintiff's Informal Complaint responded to alleged discrimination of the basis of race, gender, and color.  (Mem. Ex. 29.)  Plaintiff, in an e-mail exchange with USPTO EEO Specialist Lisa Wade Dill, states that he "specifically addressed a complaint against a staff member at the [Academy] based on racism and colorism."  (Mem. Ex. 29.)  Thus, the question is whether Plaintiff was objectively reasonable in his beliefs that he was being discriminated on the basis of race, gender, and color.

The record is devoid of *any* evidence, aside from Plaintiff's own conclusory statements, that any USPTO employee discriminated on the basis of his race, gender, or color.  Plaintiff offers no examples of how other employees in similar

situations, *i.e.*, who after asking for a pay advance were treated differently.  Plaintiff offers no statements or other evidence corroborating his allegations.

In his deposition, Plaintiff identifies four USPTO employees who discriminated against him on the basis of race or color: Irondi, Pwu, Wang, and Jin Ng, the Academy Director, (Mem. ¶ 16).  With respect to Irondi, who, like Plaintiff, is African-American, Plaintiff asserts that she discriminated against him on the basis of color, because she was of a lighter skin tone.  (Perry Dep. Tr. 53:3-6, at Mem. Ex. 4.)  Plaintiff based his conclusion on the ground that "maybe [Irondi] thought she was better than [Plaintiff]" due to her skin-tone.  (Perry Dep. Tr. 53:25-54:4, at Mem. Ex. 4 ("Q. And what leads you to the conclusion that your skin tone had some influence on her reporting the matter? A. Maybe she thought she was better than I am. I can't rationalize discrimination.").)  With respect to Pwu, Plaintiff testified that he believed Pwu was discriminating against him because Pwu seemed to believe the version of events that Irondi had given, "automatically assum[ing] that what April Irandi [sic] was saying was true and that I was being a boisterous person, which I was not." (Perry Dep. Tr. 53:3-6, at Mem. Ex. 4.)  With respect to Wang, Plaintiff asserts that Wang "had seen me . . . so he knew what my physical appearance was. In passing, I don't believe at that time that I'd met him [sic]

but I had passed him in the hall and seen him in the lectures. And that's it, I'll stop right there." (Perry Dep. Tr. 54:13-17, at Mem. Ex. 4.) And with respect to Ng, Plaintiff asserts that Ng "did not want to look into the incident [with Irondi] and . . . merely supported the accusations of his lower management chain." (Perry Dep. Tr. 54:23-551, at Mem. Ex. 4.)

These statements are all the evidence in the record of the alleged discrimination. They are, in effect, unsupported speculation on the part of Plaintiff. Unsupported speculation is not enough to withstand a motion for summary judgment. *See* *Ash*, 800 F.2d at 411-12. No objectively reasonable person in Plaintiff's position would believe, based on the facts posited by Plaintiff, that he or she was being discriminated against on the basis of race, gender, or color. Accordingly, the Court finds that Plaintiff cannot show that he was actually discriminated against on this basis, or that he could have reasonably believed that he was.

* * *

For the reasons set forth above, taking the record in the light most favorable to Plaintiff, his Informal Complaint was opposition, not participation, activity. No reasonable trier of fact could find that Plaintiff's opposition activity was in response to employment actions he could reasonably have believed to be unlawful. Thus, Plaintiff has failed to

establish a *prima facie* case of retaliation under Title VII, and the Court will grant summary judgment in favor of the Defendant as to Plaintiff's Title VII claim.

### ii.  Defense of Valid Reason to Terminate

Because, for the reasons set forth above, the Court finds that Plaintiff has failed to establish a prima facie case of retaliation under Title VII, the Court does not reach Defendant's proffered defense of a valid, legitimate reason to terminate Plaintiff's employment. Accordingly, Plaintiff's Motion to Exclude Testimony and Evidence or, in the Alternative, for an Adverse Inference Instruction or, in the Alternative, to Re-Open Discovery [Dkt. 35] will be denied as moot.

### IV.  Conclusion

For these reasons, the Court will grant Defendant's Motion.

An appropriate Order will issue.


|                        | /s/                                |
| ---------------------- | ---------------------------------- |
| March 2, 2011          | James C. Cacheris                  |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE |